# IN THE UNITED STATES DISTRICT COURT
# For THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| GLENNIS EDWARD LIGON, ) </br> ) </br> Plaintiff, ) </br> ) Civil Action No. 3:13-cv-00267 </br> v. ) Judge Nixon / Knowles </br> ) </br> CAROLYN W. COLVIN, ) </br> **Acting Commissioner of Social Security,** ) </br> ) </br> Defendant. ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Pleadings, which the undersigned will construe as a Motion for Judgment on the Administrative Record. Docket No. 8. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 13.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed his applications for DIB and SSI on May 20, 2009, alleging that he had been disabled since June 30, 2008, due to heart attacks, asthma, high blood pressure, high cholesterol, acid reflux disease, slow learning, and unspecified substance abuse. Docket No. 4, Attachment ("TR"), TR 63-72, 117-123, 124-130. Plaintiff's applications were denied both initially (TR 63-64, 65-66) and upon reconsideration (TR 67-69, 70-72). Plaintiff subsequently requested (TR 86) and received (TR 88-105) a hearing. Plaintiff's hearing was conducted on August 3, 2011, by Administrative Law Judge ("ALJ") Barbara Kimmelman. TR 29-62. Plaintiff and vocational expert ("VE"), Michelle McBroom-Weiss, appeared and testified. *Id*.

On September 21, 2011, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 5-28. Specifically, the ALJ made the following findings of fact:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since January 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: obesity; hypertension; gastroesophageal reflux disease with hiatal hernia; history of coronary artery disease and myocardial infarction; diabetes mellitus with neuropathy; mood disorder not otherwise specified; mild mental retardation; cocaine dependence in remission; and cannabis abuse (20 CFR 404.1520(c) and 416.920 (c)).

4  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) that is limited to occasional lifting of fifty pounds; frequent lifting of twenty-five pounds; sitting, standing, and walking for up to six hours each in an eight-hour workday; frequent postural activities but only occasional climbing of ladders, ropes, and scafoflds; and avoiding work requiring exposure to the sun. Additionally, the claimant is limited to one-to-three step routine, repetitive tasks and should not work with the public.

6. The claimant is capable of performing past relevant work as a grill cook and dishwasher. These jobs do not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

TR 10-24.

On October 17, 2011, Plaintiff timely filed a request for review of the hearing decision. TR 4. January 24, 2013, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the

extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484

F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

5

> "listed" impairments[1] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

---

[1] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

6

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that he meets the requirements for Listing 12.05(C) and, as a result, is disabled as a matter of law. Docket No. 9. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence ofur of § 405(g) states as ofllows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

Plaintiff contends that he meets the requirements for Listing 12.05(C) and is therefore disabled as a matter of law. Docket No. 9. Specifically, Plaintiff maintains that he has had the

requisite "additional impairments," IQ scores, and deficits in adaptive functioning since before age 22. *Id*. Plaintiff contends that his "severe impairments, including obesity, hypertension, gastroesophageal reflux disease and hiatal hernia, history of coronary artery disease, and diabetes mellitus with neuropathy" satisfy the "additional impairments" requirement. *Id*. at 4. Plaintiff argues that his assessed IQ scores between 60 and 70, which classify him as mildly mentally retarded, satisfy the requisite IQ limitation. *Id.* at 5. Plaintiff asserts that his mental retardation includes deficits in adaptive functioning, and that these deficits have persisted since before the age of 22. *Id*. at 5-6. Finally, Plaintiff argues that, although the ALJ evaluated Plaintiff's claim under Listings 12.04 and 12.09, the ALJ failed to evaluate his claim under Listing 12.05(C). *Id*. at 6-7.

Defendant contends that, although Plaintiff has an IQ between 60 and 70, he does not suffer the requisite deficits in adaptive functioning. Docket No. 13. Defendant also responds that Plaintiff's condition has been assessed as mild by two medical consultants and the ALJ, and argues that "mild" is not likely to meet the standard for Listing severity. *Id*.

With regard to Listing 12.05(C), "Intellectual Disability,"[2] the Code of Federal Regulations states:

> Intellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

---

[2] At the time Plaintiff filed the instant action, the title of Listing 12.05 was "Mental Retardation," and the first sentence started "Mental retardation refers to..." While the title and first two words have since been changed to "Intellectual Disability," the remainder of the Listing's language and requirements are unchanged.

8

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 12.05(C).

Paragraph C of Section 12.00 for Mental Disorders explains:

> C. *Assessment of severity*. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a and 416.920a.

20 CFR Pt. 404, Subpt. P, App. 1, 12.00(C).

As an initial matter, in order to meet Listing 12.05(C), Plaintiff must satisfy the three requirements in the introductory paragraph (*i.e.*, (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) onset of said deficits before age 22), as well as those contained in one of the four following sections (*i.e.*, A, B, C, or D).

With regard to Plaintiff's mental limitations, the ALJ explicitly discussed whether Plaintiff's mental limitations met or medically equaled the requirements for Listings 12.04 and 12.09. TR 11-12. Although Plaintiff is correct that the ALJ did not explicitly analyze Listing 12.05, she properly analyzed the severity of Plaintiff's functional limitations pursuant to 20 CFR

9

Pt. 404, Subpt. P, App. 1, 12.00(C), which applies to *all* Listings in Section 12. Specifically, the ALJ stated:

> In activities of daily living, the claimant has mild restriction. The claimant reported that he could prepare elaborate meals, wash dishes, vacuum, sweep, and do laundry (Exh. 5F-3). He also reported that he drove regularly and had little or no difficulty managing his medications (Exh. 5F-3). A recent psychological evaluation demonstrated that the claimant had some difficulty with self-care (Exh. 17F-10). However, at the hearing the claimant testified that he does chores and runs errands for his parents. When questioned about chores around his own house, the claimant stated that he helps clean up and take the trash out, but that he does not have to do anything else because his live-in friend does the rest. Based on the claimant's own reports and testimony, the undersigned finds that he has mild limitations in activities of daily living.
>
> In social functioning, the claimant has moderate difficulties. The claimant reported that his main social support was his girlfriend (Exh. 5F-3) and often endorsed symptoms of social isolation and mood swings. He also reported that he becomes verbally aggressive when he drinks and smokes (Exh. 12F-3). However, the evidence of record shows that the claimant has been able to perform some work activity for friends after the alleged onset date and he testified that he plans to attend vocational school, suggesting that he is capable of interacting well with others. The undersigned therefore finds that the claimant has moderate limitations in social functioning.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant suffers from mild mental retardation and results of psychological evaluations show that he has limitations in his ability to maintain attention and concentration. However, again, the claimant has performed work activity after the alleged onset date without any reported psychological problems. Nevertheless, the claimant is given the benefit of the doubt and the undersigned finds that he has moderate limitations in concentration, persistence, and pace.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

TR 11-12.

When determining that Plaintiff experienced mild limitations in activities of daily living, moderate limitations in social functioning and in maintaining concentration, persistence, and pace, and no episodes of decompensation, the ALJ discussed Plaintiff's mental health records as follows:

> As for the claimant's mental impairments, the medical evidence of record reflects diagnoses of mild mental retardation, mood disorder not otherwise specified, cocaine dependence in remission, and cannabis abuse. On August 26, 2009, he underwent a psychological evaluation conducted by Kimberly Tartt-Godbolt, Psy.D. He reported last receiving outpatient psychiatric care in elementary school and no history of inpatient mental health treatment (Exh. 5F-2). He admitted to a history of cocaine and marijuana use and alcohol abuse, but he claimed that he had not used cocaine in a year or smoked marijuana in six months (Exh. 5F-2). He stated that he only drank "lightly" one or two times a week (Exh. 5F-2).
>
> On evaluation, the claimant endorsed symptoms of irritability, social isolation, occasional crying spells, and low energy and motivation (Exh. 5F-2). However, he denied any homicidal or suicidal ideation, hallucinations, or panic attacks (Exh. 5F-2). He explained that he did not have good or bad days, but that all his days were the same (Exh. 5F-2).
>
> Dr. Tartt-Godbolt administered the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV") and the Wide Range Achievement Test - Fourth Edition ("WRAT4"). Based on the claimant's results on the WAIS-IV, Dr. Tartt-Godbolt found that there was a ninety-five percent change [*sic*] of his full scale IQ score falling between sixty-two and seventy, placing him in the extremely low to borderline range of intelligence (Exh. 5F-3). Dr. Tartt-Godbolt concluded that the claimant might experience "great difficulty in keeping up with his peers in a wide variety of situations that require thinking and reasoning abilities" (Exh. 5F-3).
>
> On the WRAT4, the claimant's scores in word reading and math computation indicated abilities equivalent to that of a third grader,

11

spelling equivalent to that of a second grader, and sentence comprehension equivalent to that of a first grader (Exh. 5F-6). Dr. Tartt-Godbolt found that these scores demonstrated a marked impairment in the claimant's overall intellectual abilities (Exh. 5F-9).

Based on her overall evaluation, Dr. Tartt-Godbolt diagnosed the claimant with mild mental retardation and polysubstance dependence (Exh. 5F-9). She noted that he showed evidence of moderate impairment in his short-term memory and ability to sustain concentration, but only mild impairment in his long-term and remote memory functioning and ability to interact with others and adapt to change (Exh. 5F-9). She further found that he appeared capable of following instructions, both written and spoken (Exh. 5F-9).

Lastly, Dr. Tartt-Godbolt gave the claimant a Global Assessment of Functioning ("GAF") score of fifty-seven (Exh. 5F-9). GAF scores are subjective ratings of the social, occupational, and psychological functioning of adults. A GAF score of fifty-seven suggests moderate symptoms or moderate difficulty in social, occupational, or school functioning (<u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed.).

Following his evaluation, the claimant did not seek any mental health treatment until January 8, 2010, when he presented to Centerstone Mental Health Center ("Centerstone") for an intake assessment. He endorsed symptoms of mood swings, decreased energy and motivation, a recent history of suicide ideation, and social isolation (Exh. 11F-8). He reported that he had not used cocaine for about a year and a half but admitted to ongoing marijuana use (Exh. 11F-7). He was diagnosed with mood disorder not otherwise specified, cocaine dependence in remission, and cannabis abuse (Exh. 11F-8, 9).

A Tennessee Clinically Related Group form ("CRG") was also completed. The purpose of the CRG assessment is to provide operational definitions based on Federal guidelines for classifying persons with mental illness into one of five groups: (1) persons with severe and persistent mental illness; (2) persons with severe illness; (3) persons who are formerly severely impaired; (4) persons with mild or moderate mental disorders; and (5) persons that are not in the clinically related groups one through four as a result of their diagnosis. These classifications are based on

diagnosis, severity of functional impairment, duration of functional impairment, and need for services to prevent relapse. CRGs also provide narrative ratings in four general function areas - activities of daily living; interpersonal functioning; concentration, task performance and pace; and adaptation to change - as well as GAF scores.

In the claimant's CRG, he was categorized as a person with severe and persistent mental illness and given a GAF score of forty-eight, indicating serious symptoms or any serious impairment in social, occupational, or school functioning (Exh. 11F-4); Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision). He was found to have moderate limitations in all of the functional areas except for interpersonal functioning, in which he was found to have marked limitations (Exh. 11F-2, 3). However, this finding of marked limitations seems to have been based on the claimant's history of violent behavior rather than his then current reported symptoms (Exh. 11F-2).

On January 13, 2010, the claimant returned to MHC for an individual therapy session but was referred to group therapy (Exh. 16F-47). It was noted that he presented with a cooperative attitude, appropriate affect, normal mood, and logical thought process (Exh. 16F-47).

On January 19, 2010, the claimant attended a dual diagnosis group therapy session at MCH. He again presented with appropriate mood and actively participated in the session (Exh. 16F-46). It was noted that he had shown slight improvement in his substance use (Exh. 16F-46).

On January 26, 2010, the claimant underwent a psychiatric evaluation at MHC. His diagnoses were confirmed as mood disorder not otherwise specified, cocaine dependence in remission, and cannabis abuse, and he was started on citalopram (Exh. 16F-13, 14).

After missing two appointments, the claimant returned to MHC on February 23, 2010. He reported that he felt better and did not have any problems (Exh. 16F-42). However, he explained that he could feel his medication wearing off in the afternoon and was therefore given an increased dosage (Exh. 16F-42, 43).

On April 5, 2010, he reported that his medication was still working

13

(Exh. 16F-39). However, he stated that it he [*sic*] had started craving marijuana since starting and increasing his citalopram dosage (Exh. 16F-39). He was taken off citalopram and started on a trial of fluoxetine to see if that would be effective in treating his symptoms and lessening his cravings (Exh. 16F-40).

On June 22, 2010, the claimant reported that he had been doing "really good" (Exh. 16F-36). He stated that he still smoked marijuana, but did so less frequently and had less cravings (Exh. 16F-36).

On September 20, 2010, the claimant's fluoxetine dosage was increased after he reported that he had been "snappy and more depressed" (Exh. 16F-34, 35). On December 13, 2010, his medication was increased again after complaints of ongoing anger (Exh. 16F-32, 33). He also complained of sleeping difficulties and was prescribed doxepin (Exh. 16F-32, 33). He was subsequently taken off of doxepin because of his history of heart problems and instead prescribed trazodone (Exh. 16F-31).

The claimant returned to MCH on March 7, 2011, complaining that he was "done" after taking his medication and did not have the "get up power" (Exh. 16F-30). However, on May 25, 2011, he stated that he smoked marijuana every other day to calm him down, explaining that he had "excess energy without it" (Exh. 16F-25). He also mentioned that he drank beer occasionally and was told that alcohol was not good for his diabetes (Exh. 16F-25).

On June 21, 2011, the claimant underwent another psychological evaluation, this one conducted by Cynthia P. Rush, a licensed senior psychological examiner. Ms. Rush administered the WAIS-IV, on which the claimant obtained a full scale IQ score of sixty-one, placing him in the mildly mentally retarded range (Exh. 17F-8). Ms. Rush noted that the claimant's true IQ score was likely somewhere within the range of fifty-eight to sixty-six (Exh. 17F-8). Ms. Rush also administered the Vineland Adaptive Behavior Scales - Second Edition ("VABS-II"), on which the claimant obtained scores demonstrating low general adaptive functioning skills (Exh. 17F-9). His performance on the VAB-II showed that he had difficulty carrying out three-part instructions, following directions, explaining ideas, read or understand material of at least a fourth-grade level, taking medication as directed, complying with medical treatment, using household products correctly, and managing his finances (Exh. 17F-10).

Based on her overall evaluation, Ms. Rush diagnosed the claimant with mild mental retardation, depressive disorder not otherwise specified, and anxiety disorder by history (Exh. 17F-10). She gave him a GAF score of fifty, suggesting serious symptoms or any serious impairment in social, occupational, or school functioning (Exh. 17F-10; Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision). She opined that, due to the claimant's intellectual functioning, low adaptive behavior skills, medical problems, and symptoms of depression, he might have difficulty in self-care as he lacked the "basic skills needed to manage his personal resources or plan for his self-sufficiency" (Exh. 17F-10). She also opined that he had minimal marketing skills and that he might have limitations in setting vocational goals (Exh. 17F-10).

On June 22, 2011, the claimant returned to MHC complaining of problems primarily resulting from his physical impairments but mentioned that his "nerves [were] bad" and that he was "moodier" because things were not going the way he wanted them to (Exh. 16F-20). However, he also stated that Prozac (fluoxetine) helped to control his anger and keep him calm (Exh. 16F-20).

No additional mental health treatment records were provided.

. . .

As for the claimant's mental impairments, the medical evidence of record documents very little mental health treatment. On evaluation by Dr. Tartt-Godbolt, the claimant was found to have marked impairment in his overall intellectual abilities and potential difficulty in keeping up with his peers in situations requiring thinking and reasoning. However, Dr. Tartt-Godbolt opined that the claimant had no more than moderate mental limitations.

At his intake assessment at MHC, the claimant was found to have marked impairment in interpersonal functioning, but this was based on his history of violent behavior and not his then current reported symptoms. Over his course of treatment at MHC, the claimant responded well to medication, consistently reporting improvement in his symptoms.

The claimant recently underwent another psychological evaluation, the results of which showed that he had low general adaptive functioning skills and limitations in setting vocational goals.

15

> However, these findings were inconsistent with the overall
> evidence of record. The claimant reported that he is capable of
> performing a variety of household chores, but that he does not
> have to do certain things because of his live-in friend. Choosing
> not to carry out certain tasks because one does not have to is not
> the same as lacking the ability to perform those tasks.
> Additionally, the claimant testified that his problems with
> performing concrete work were not based on any mental symptoms
> or limitations but sun exposure. Further, the claimant has held
> both skilled and semi-skilled jobs, and he expressed his intent to
> return to vocational rehabilitation and attend vocational school.

TR 17-22.

The ALJ also discussed Plaintiff's testimony and subjective complaints, recounting in part:

> The claimant testified that he cannot work because his medications
> make him tired, adding that he does not even have the strength to
> stand without becoming tired. He also testified that he does not
> "function right" when taking his medications. However, he stated
> that his doctors have only limited him to minimal sun exposure,
> advising him not to "get too hot."
>
> When questioned about his work as a concrete laborer, the
> claimant testified that he stopped because his "body wouldn't let
> [him] get out there in the sun and do what it normally would do."
> He testified that he recently went to vocational rehabilitation, but
> explained that he did not perform all of the tests completely
> because he was not "functioning right." He stated that he plans to
> return to vocational rehabilitation and see about going to
> vocational school.

TR 20.

With regard to her evaluation of the opinion evidence concerning Plaintiff's mental impairments, the ALJ stated:

> As for the mental assessments, significant weight is given to the
> opinion of Dr. Warren, the State agency psychological consultant,
> that the claimant can understand and remember simple

16

> instructions; attend and concentrate for periods of two hours; interact appropriately with peers and supervisors but should not work the [*sic*] public; and adapt to routine workplace changes (Exh. 13F-3). Significant weight is also given to the assessment of State agency psychological consultant Victor L. O'Bryan, Ph.D., that the claimant can perform one-to-three step tasks, concentrate for such tasks, and adapt to infrequent changes in a work routine (Exh. 10F-3). The undersigned finds that these assessments are consistent with the evidence of record as a whole, particularly the findings of consultative examiner Dr. Tartt-Godbolt and the MHC treatment records which reflect improved psychological symptoms with medication.
>
> Significant weight is also given to the assessment of Dr. Tartt-Godbolt inasmuch as it reflects no more than moderate mental limitations. The findings of Ms. Rush, who conducted the most recent psychological evaluation of the claimant, is given little weight as it is inconsistent with the claimant's own reported activities.

TR 22.

The ALJ also observed:

> The claimant testified that he continued to do some work after his alleged onset date and this is corroborated by the medical evidence of record. On February 17, 2009, he reported that he had injured himself while at work, and in September 2009 he sought treatment on two separate occasions after getting sick while doing concrete work. He testified that his problem with performing concrete work was sun exposure and that he has been told by his doctors to avoid getting too hot, adding that this was the only restriction given.
>
> . . .
>
> . . . Additionally, the claimant testified that his problems with performing concrete work were not based on any mental symptoms or limitations but sun exposure. Further, the claimant has held both skilled and semi-skilled jobs, and he expressed his intent to return to vocational rehabilitation and attend vocational school.
>
> The claimant testified that he cannot work because his medications make him tired. However, this is inconsistent with his recent report that he smoked marijuana every other day to calm down

>because otherwise he would have "excess energy."
>
>Lastly, the undersigned notes that on June 21, 2011, the claimant reported that he worked for a friend pouring concrete but had not worked in two months because he was tired. The undersigned finds that this was inconsistent with the claimant's testimony that he last did concrete work in September 2009. Additionally, this shows that the claimant is capable of performing work as long as he avoids sun exposure.

TR 21-22.

As can be seen, although the ALJ did not explicitly discuss Listing 12.05(C), she addressed the relevant evidence in detail and determined that Plaintiff's impairments did not meet or medically equal a listing. In so doing, the ALJ discussed, *inter alia*, the inconsistencies within and between the medical and testimonial evidence; Plaintiff's medications, their reported efficacy and side effects; Plaintiff's reported activities, including that he had worked after his alleged onset date; Plaintiff's testimony and subjective complaints, including the fact that the primary reason given by Plaintiff for his alleged inability to return to work was physical, not mental; and Plaintiff's stated intent to return to vocational rehabilitation and attend vocational school. Ultimately, the ALJ found that Plaintiff could perform past relevant work, as well as perform other jobs identified by the VE as available and appropriate. Based on the evidence of record, this determination was proper. The record, as properly considered by the ALJ, simply does not support Plaintiff's contention that he suffered deficits in adapative functioning of the requisite severity, much less that the onset of his alleged impairment was before age 22. The ALJ considered the objective and testimonial evidence, reached a reasoned decision, and articulated the basis for that decision. The ALJ's decision was supported by substantial evidence, and the record does not support Plaintiff's assertion that he met the criteria of Listing

12.05(C) such that he was disabled as a matter of law.

Because the ALJ properly evaluated the evidence of record and the ALJ's decision is supported by substantial evidence, the ALJ's decision should stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge