IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GLENNIS EDWARD LIGON, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | No. 3:13-cv-00267 |
| v. ) | |
| ) | Judge Nixon |
| CAROLYN W. COLVIN, ) | Magistrate Judge Knowles |
| Acting Commissioner of Social Security, ) | |
| ) | |
|     Defendant. ) | |

**ORDER**

Pending before the Court is Plaintiff Glennis Edward Ligon's Motion for Judgment on the Pleadings ("Motion"). (Doc. No. 8.) On June 17, 2014, Magistrate Judge Knowles issued a Report and Recommendation ("Report") recommending that Ligon's Motion be denied and the decision of the Social Security Administration be affirmed. (Doc. No. 14 at 19.) On July 1, 2014, Ligon filed Objections to the Report (Doc. No. 15), to which the Commissioner did not respond. For the reasons stated below, the Court **GRANTS** Ligon's Motion, **VACATES** the Administrative Decision, and **REMANDS** this case to the Social Security Administration for the calculation of benefits. The Clerk of the Court is **DIRECTED** to close the case.

**I.    STANDARD OF REVIEW[1]**

The Court's review of the Report is *de novo*. 28 U.S.C. § 636(b) (2012). This review, however, is limited to "a determination of whether substantial evidence exists in the record to support the [Commissioner's] decision and to a review for any legal errors." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act

---
[1] Finding the parties have adequately summarized the facts and procedural posture of this case, the Court refers to the facts below only as necessary to facilitate its evaluation of Plaintiff's Motion.

1

provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, the reviewing court will uphold the Administrative Law Judge's ("ALJ") decision if it is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence is a term of art and is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison*, 305 U.S. at 229).

"Where substantial evidence supports the [Commissioner's] determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc)). This standard of review is consistent with the well-settled rule that the reviewing court in a disability hearing appeal is not to weigh the evidence or make credibility determinations because these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). Thus, even if the Court would have come to different factual conclusions as to the Plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

## II. LIGON'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT

Ligon contends he has an intellectual disability[2] as defined by Listing 12.05(C), and the ALJ erred because she did not assess whether Ligon met or equaled the listing. The Magistrate Judge recommended Ligon's Motion be denied because the ALJ considered whether Ligon met the severity requirements for Listings 12.04 and 12.09—which apply "to *all* Listings in Section 12" (Doc. No. 14 at 10 (emphasis original))—and because he did not, he could not be disabled under Listing 12.05. Furthermore, the Magistrate Judge determined the record "simply does not support Plaintiff's contention that he suffered deficits in adaptive functioning of the requisite severity, much less that the onset of his alleged impairment was before age 22." (*Id.* at 18.) Ligon objects to these rationales, arguing the Magistrate Judge applied the wrong legal standard and his conclusions about Ligon's deficits in adaptive functioning and onset age are not supported by evidence in the record. (Doc. No. 15 at 9–10.) Ligon moves that the Court reverse the decision of the Commissioner and award benefits. For the reasons stated below, the Court grants Ligon's Motion in full.

### A. Listing 12.05(C)

As Ligon correctly notes, the severity requirements applicable to Listing 12.04 and other mental disorders do not apply to Listing 12.05(A)–(C); instead, "Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria," the

---

[2] The Court notes that the parties and the ALJ continue to the use the term "mental retardation," despite the fact that the relevant Listing refers to this disability as Intellectual Disability, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05, and despite the passage of Rosa's Law in 2010, which eliminated references to "mental retardation" and "the mentally retarded" in federal law and replaced them with "intellectual disability" and "individuals with intellectual disabilities," Pub. L. No. 111-256, 124 Stat. 2643.

claimant meets the listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Accordingly, to meet Intellectual Disability Listing 12.05, claimants must establish that they meet the diagnostic criteria: (1) "significantly subaverage general intellectual functioning" and (2) "deficits in adaptive functioning," both of which must have begun before age twenty-two. § 12.05; *accord Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Ligon claims he meets Listing 12.05(C), thus he must also meet the C paragraph criteria: (3) "A valid verbal, performance, or full scale IQ of 60 through 70," and evidence of (4) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." § 12.05(C).

The ALJ need not evaluate the claimant according to every listing; however, where the record raises a "substantial question" as to whether the claimant meets a listing, the ALJ must address that listing in her decision. *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641–42 (6th Cir. 2013) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). The record raises a substantial question where there is evidence in the record that demonstrates the claimant "reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014); *see Sheeks*, 544 F. App'x at 642 (finding no substantial question and denying remand because there was no record evidence demonstrating the onset of deficits in adaptive functioning before age twenty-two); *Abbott*, 905 F.2d at 925 (finding substantial question where claimant had an IQ of 56, a score that meets the intellectual disability listing on IQ alone). If the ALJ failed to address a listing, but the record presents a substantial question as to each element of the listing, the ALJ's determination is not supported by substantial evidence and remand is appropriate. *Sheeks*, 544 F. App'x at 642.

4

1. IQ Score

First, Plaintiff must present evidence of a "valid . . . IQ of 60 to 70." § 12.05(C). A valid IQ score reflects Plaintiff's "true abilities," *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991), and is consistent with "the individual's customary behavior and daily activities" and "developmental history," § 12.00(D)(5)(c), (D)(6)(a). Ligon presents a full-scale IQ score of 65 from an August 26, 2009, administration of the Wechsler Adult Intelligence Scale—Fourth Edition ("WAIS-IV"); the examiner, Dr. Kimberly Tartt-Godbolt, noted "there is a 95% likelihood of the claimant's true FSIQ falling between 62–70." (Tr. 274.)[3] Dr. Tartt-Godbolt asked Ligon about his personal history and current activities of daily living and noted he "had special education for all of his subjects" in school (Tr. 273) and "manages his finances with some difficulty" (Tr. 274). Dr. Tartt-Godbolt also found Ligon "showed no evidence of malingering" (*id.*) and that his intellectual abilities were commensurate with his academic achievement test results (Tr. 280). Ligon also presents a full-scale IQ score of 61 from a June 21, 2011, administration of the WAIS-IV. (Tr. 517.) The examiner, Cynthia P. Rush, noted "this appears to be a reliable and valid assessment of his current intellectual functioning." (Tr. 516.) Ligon could reasonably meet or equal the requirement of a valid IQ score of 60 to 70.

2. Additional and Significant Work-Related Limitation

Second, Ligon must present evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function." § 12.05(C). A claimant meets this requirement if he has "a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." § 12.00; *see Kidd v. Comm'r of Soc. Sec. Admin.*, 7 F. App'x 483, 490 (6th Cir. 2001). In this case, the ALJ determined Ligon has multiple severe impairments under 20 C.F.R.

---

[3] The administrative record is available electronically at Docket Number 4.

§ 404.1520(c) at step three in the five-step disability analysis. (Tr. 10.) Ligon has presented evidence that he could reasonably meet this requirement of the listing.

### 3. General Intellectual Functioning

Third, Ligon must present evidence of "significantly subaverage general intellectual functioning" that began before age twenty-two. § 12.05. Intellectual functioning includes tasks such as "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience," *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013) ("DSM-V"), and claimants typically rely on academic records and IQ tests to establish their level of intellectual functioning. *See, e.g.*, *Sheeks*, 544 F. App'x at 642; *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007). Ligon presents his WAIS-IV full-scale IQ scores of 61 and 65 as evidence of his intellectual functioning. Dr. Tartt-Godbolt also administered the Wide Range Achievement Test—4th Edition ("WRAT4") and found Ligon's Word Reading skill was in the first percentile, "comparable to the average score of students in the standardization sample who were in the 7th month of Grade 3." (Tr. 277.) Ligon's Sentence Comprehension skill was comparable to that of students in the ninth month of Grade One, his Spelling skill was comparable to that of students in the fourth month of Grade Two, his Math Computation skill was comparable to that of students in the second month of Grade Three, and his Reading Composite score was equivalent to "a percentile rank of 0.4." (Tr. 277–78.)

Ligon also presents evidence that this deficit developed before the age of twenty-two. Although most of Ligon's school records were destroyed pursuant to Tennessee law, the record indicates Ligon was evaluated, identified, and served as an individual with a disability. (Tr. 140.) In four years of Tennessee Proficiency testing, Ligon received only one passing score. (Tr. 142.) Furthermore, although he graduated from high school, he earned a special education diploma (Tr.

6

34, 169) after being enrolled in all special education classes (Tr. 273). Ligon is not required to provide an IQ test within the qualifying range from his youth; he is only required to provide evidence of "significantly subaverage general intellectual functioning" before age twenty-two. § 12.05; *see Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 415–16 (6th Cir. 2014). Ligon has presented evidence that he could reasonably meet this requirement of the listing.

      4.  <u>Adaptive Functioning</u>

Finally, Ligon must present evidence of "deficits in adaptive functioning" that began before age twenty-two. § 12.05. The Listing does not qualify this element in any way. *Id.* However, "[t]he definition of [intellectual disability] we use in our listings is consistent with, if not identical to, the definitions of [intellectual disability] used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002); *see Brown*, 948 F.2d at 270 (12.05(C) tracks DSM listing for mild intellectual disability). Furthermore, "deficits in adaptive functioning" is an element of the Diagnostic and Statistical Manual of Mental Disorders' definition of intellectual disability, and of the definitions espoused by all other relevant professional organizations. Thus, to diagnose a claimant with an intellectual disability, the medical source must first determine the claimant has deficits in adaptive functioning. *See infra*; *Durden v. Astrue*, 586 F. Supp. 2d 828, 833 (S.D. Tex. 2008) (surveying professional organizations' definitions). The only two medical sources to assess Ligon for intellectual disability both diagnosed him with mild intellectual disability. (Tr. 280, 519.) Therefore, two medical sources have determined Ligon demonstrates deficits in adaptive functioning and meets this element of the listing.

The ALJ apparently disregarded Ligon's IQ scores because, in her estimation, Ligon's adaptive functioning was not consistent with his low scores. (Tr. 21, 58.) However, under the

7

Social Security Administration's rules, a medical consultant or psychological consultant must "affirm that adaptive functioning is consistent with IQ test results." SSA Program Operations Manual System DI24515.056(D)(2) Evaluation of Specific Issues—Mental Disorders—Determining Medical Equivalence (2012) [hereinafter POMS DI24515.056]. The ALJ may not substitute her own judgment for that of a medical source where, as here, the POMS makes the "judgment of an MC/PC [medical consultant or psychological consultant] *necessary*" to an assessment of adaptive functioning. *Id.* (emphasis added). Instead, the ALJ must consider Dr. Tartt-Godbold and Ms. Rush's opinions according to "the examining relationship (or lack thereof), specialization, consistency, and supportability" in determining how they should be weighed, and the ALJ's ultimate decision as to the plaintiff's disability must be supported by substantial evidence in the record. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), reh'g denied (May 2, 2013) (citing 20 C.F.R. § 404.1527(c)). The ALJ failed to follow this requirement.

Adaptive functioning refers to "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background" and accounts for "adaptive reasoning in three domains: conceptual, social, and practical." DSM-V at 37. A person demonstrates deficits in adaptive functioning consistent with intellectual disability "when at least one domain of adaptive functioning . . . is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38; *see, e.g.*, *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 463 (6th Cir. 2012) (graduating high school and mothering not inconsistent with mild intellectual disability where Plaintiff had individual education plan and parenting assistance); *West*, 240 F. App'x at 698.

"The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization." DSM-V at 37. For an individual with a mild intellectual disability, "competitive employment is often seen in jobs that do not emphasize conceptual skills," and support is needed "to learn to perform a skilled vocation competently." *Id.* at 34. For individuals with moderate intellectual disability, "[i]ndependent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from . . . others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management." *Id.* at 35; *Brown*, 948 F.2d at 270 (finding that individuals with mild intellectual disability "usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance").

Thus, courts have found claimants whose work includes "complicated tasks" do not demonstrate deficits in adaptive functioning. *See, e.g.*, *Carmack v. Barnhart*, 147 F. App'x 557, 560–61 (6th Cir. 2005) (holding that work history of business ownership, bookkeeping, and court reporting inconsistent with finding of mild intellectual disability because history showed Plaintiff had not manifested deficits in adaptive functioning); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872–73 (6th Cir. 2003) (determining that work history as a hair stylist with a cosmetology license and as a bus driver indicated claimant had "an ability to perform relatively complicated tasks" and no deficit in adaptive functioning); *Foster*, 279 F.3d at 355 (finding that employment as an accounting clerk in a bank and liquor store indicate claimant could perform relatively complicated tasks). However, a work history limited to unskilled labor—or jobs that "do not emphasize conceptual skills" or "require limited conceptual and communication skills,"

9

DSM-V at 34–35—is consistent with the deficits in adaptive functioning described by listing 12.05(C). *See, e.g.*, *Brown*, 948 F.2d at 270 (finding that work as truck driver not inconsistent with mild intellectual disability where claimant was required to drive and record mileage, hours, and destinations); *Whitehead v. Comm'r of Soc. Sec. Admin.*, No. 13-1231-T, 2014 WL 3952839, at *5 (W.D. Tenn. Aug. 13, 2014) ("[N]either sawing trees or loosening and tightening wheel lug nuts suggests intellectual capacity beyond that found by the psychologists who examined Plaintiff and . . . concluded that he met the diagnostic criteria for mild [intellectual disability].").

Ligon's work history consists largely of unskilled jobs including concrete laborer, grill cook, fry cook, and dishwasher. (Tr. 23, 35–37, 48–50, 54–56.) Although the work of fry cook is categorized as semi-skilled, the Vocational Expert testified that the job as performed by Ligon was "routine." (Tr. 56). Contrary to the ALJ's assessment (Tr. 59), the tasks required by Ligon's past jobs do not suggest adaptive functioning beyond that of someone with a mild intellectual disability. Ligon also reports difficulties in the practical domain in other settings: he is unable to use a checkbook or manage a savings account (Tr. 165), has difficulty managing money (Tr. 274, 519), has difficulty following instructions (Tr. 167, 169, 380, 519), and has some short-term memory impairment (Tr. 516). Furthermore, as Ligon notes, his score on the Vineland Adaptive Behavior Scales—Second Edition ("VABS-II"), a measure "designed to estimate an individual's adaptive behavior skills," fell below the first percentile and "classifies his general adaptive functioning as low." (Tr. 518.) Ligon's limitations and VABS-II scores are consistent with the DSM-V's description of the adaptive functioning deficits of an individual with an intellectual disability.

The ALJ concluded psychological evaluations showing Ligon "had low general adaptive functioning skills" were "inconsistent with the overall evidence of record" because Ligon "is

capable of performing a variety of household chores." (Tr. 21.) This reasoning is flawed because individuals with intellectual disabilities are capable of the household chores performed by Ligon. A person with a mild intellectual disability "may function age-appropriately in personal care" but "need some support with complex daily living tasks in comparison to peers . . . [such as] grocery shopping, transportation, home and child-care organization, nutritious food preparation, and banking and money management." DSM-V at 34; *accord Brown*, 948 F.2d at 270 (concluding that ability to make change at a grocery store, do laundry, clean a room not inconsistent with listing-level deficits in adaptive functioning). For a person with a moderate intellectual disability, "participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing supports will typically occur." DSM-V at 35. Ligon reports that he lives with his girlfriend and within walking distance of his parents, who he sees regularly. (Tr. 40.) Ligon takes out the trash, helps with cleaning, and occasionally goes to the store for his parents. (Tr. 40.) However, as noted above, Ligon has difficulty with banking and money management. Ligon's performance of household tasks is consistent with the listing for intellectual disability.

Ligon also presents evidence that these deficits in adaptive functioning began before age twenty-two. The academic records discussed in Section II.A.3 above indicate Ligon had deficits in adaptive functioning in the "*conceptual (academic) domain*" as a student. DSM-V at 37. Ligon's employment history shows he began work before the age of twenty-two as a dishwasher (Tr. 35), and he has never had a job requiring a higher level of adaptive functioning (*see supra*). Ligon has presented evidence that he could reasonably meet this requirement of the listing.

11

*B. Award of Benefits*

Because the ALJ failed to address listing 12.05(C), but the record presents a substantial question as to each element of that listing, the ALJ's determination is not supported by substantial evidence and remand is required. However, Ligon asks the Court to award benefits rather than remand the case for reconsideration under Listing 12.05(C). "In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985); *accord Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

The ALJ did not directly address listing 12.05(C), but she did address evidence in the record that she believed undermined Ligon's claims under other mental disorder listings. In addition to the reasons discussed above, the ALJ found the assessments of state agency psychological consultants Rudy Warren and Victor O'Bryan were more "consistent with the evidence of record as a whole" than those of Dr. Tartt-Godbolt and Ms. Rush. (Tr. 22.) However, neither Dr. Warren nor Dr. O'Bryan assessed Ligon under Listing 12.05. (Tr. 398, 357.) Furthermore, although their assessments under the severity criteria applicable to other listings are not applicable to an assessment under Listing 12.05(C), their assessments are not inconsistent with a finding of disability under that listing: Dr. O'Bryan found Ligon "can perform 1–3 step tasks," his "concentration is limited, but adequate for simple work," and he "can adapt to infrequent changes in work routine" (Tr. 382); and Dr. Warren found Ligon can follow "simple instructions" and "adapt to routine workplace changes" but "should not work with the public" (Tr. 414). The ALJ also credited Dr. Tartt-Godbolt's assessment "inasmuch as it reflects no more

12

than moderate mental limitations" (Tr. 22); however, Dr. Tartt-Godbolt found these "moderate impairment[s]" are consistent with her diagnosis of mild intellectual disability (Tr. 280).

The ALJ identified no evidence in the record to undermine Ligon's claim under Listing 12.05(C), and upon review of the record, neither has the Court. As discussed in Section II.A above, Ligon's proof of disability under Listing 12.05(C) is strong. Accordingly, the Court concludes Ligon is disabled under Listing 12.05(C) and remands this matter to the Social Security Administration for the calculation of benefits.

### III. CONCLUSION

For the reasons stated above, the Court **REJECTS** the Magistrate Judge's Report (Doc. No. 14), **GRANTS** Ligon's Motion (Doc. No. 8), **VACATES** the administrative Decision, and **REMANDS** this case for the calculation of benefits. The Commissioner's Motion to Stay (Doc. No. 12) is **TERMINATED as MOOT**. The Clerk of the Court is **DIRECTED** to close this case.

It is so ORDERED.

Entered this the  2nd day of September, 2015.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT